# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| INGA AFANASIEVA, individually and as next friend to S.M., her minor child, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 21-1881 (RDM) |
| WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, | |
| *Defendant.* | |

## <u>MEMORANDUM OPINION AND ORDER</u>

At around 7:00 p.m. on December 6, 2019, Plaintiff Inga Afanasieva's minor son, S.M., boarded a Metrobus Route 70 bus to travel home. During the ride, a man approached S.M. and began an altercation that quickly escalated out of control. The encounter ended with the man repeatedly punching and kicking S.M., stealing his iPhone, and then fleeing the bus, leaving S.M. with a broken nose, broken jaw, and three broken teeth. To date, the assailant has not been apprehended.

Plaintiff Afanasieva brings this action individually and as next friend to her son against the Washington Metropolitan Area Transit Authority ("WMATA"), alleging that WMATA— which operated the bus where the attack occurred—negligently breached the duty of care it owed to S.M. as a passenger. WMATA has moved to dismiss the complaint for lack of subject-matter jurisdiction and failure to state a claim. For the following reasons, the Court concludes that it has jurisdiction over Plaintiffs' claim that the driver of S.M.'s bus negligently failed to intervene to prevent harm to S.M. and that Plaintiffs have plausibly alleged the elements that claim. With respect to Plaintiffs' other negligence claims, however, the Court concludes that WMATA's

sovereign immunity bars suit.  Accordingly, the Court will **GRANT** in part and **DENY** in part WMATA's motion to dismiss, Dkt. 12.

## I.  BACKGROUND

Plaintiffs' complaint alleges the following facts, which the Court accepts as true for the purpose of assessing the motion to dismiss.  *Gordon v. U.S. Capitol Police*, 778 F.3d 158, 163–64 (D.C. Cir. 2015).

At around 7:00 p.m. on December 6, 2019, Plaintiff S.M., who at the time was 15 years old, boarded a northbound Route 70 bus near 7th Street and Pennsylvania Avenue, Northwest. Dkt. 3-1 at 11 (Compl. ¶ 19).  S.M. sat near the back in a two-person seat on the bus's elevated platform.  *Id.*  S.M. sat next to the window and placed his bag on the empty seat next to him.  *Id.* Some time later, two men who appeared to be in their "late teens or early twenties" boarded the bus near Georgia Avenue.  *Id.* (Compl. ¶ 20).  The men did not pay the required fare and walked to the back of the bus, where they began to interact with a group of high-school-aged girls who were seated behind S.M.  *Id.*

After a few minutes, one of the men walked over to S.M., "stood over" him, and indicated that he wanted to sit next to him, even though there were "a number of empty seats throughout the bus."  *Id.*  (Compl. ¶ 21).  S.M. moved his bag and allowed the man to sit.  *Id.* The man then began to question S.M. about his iPhone and asked S.M. whether he would sell it. *Id.* at 12 (Compl. ¶ 21).  When S.M. refused, the man "became more aggressive with his questions."  *Id.*

At this point, the group of girls sitting behind S.M. "began to antagonize" S.M. and "encourage the man to escalate his actions."  *Id.* (Compl. ¶ 22).  The group grew so loud, Plaintiffs allege, that "everyone on the bus could hear the commotion."  *Id.*  The man then "tried

to take off [S.M.]'s glasses," prompting S.M. to "push[] the man's hand away." *Id.* Undeterred, the man responded by "dumping a bag of potato chips on [S.M.]'s head," while the girls "laughed and cheered the man on." *Id.* The man then attempted to take S.M.'s glasses a second time. *Id.* (Compl. ¶ 23). When S.M. slapped his hand away, the man "punched [S.M.] in the side of the head" and then repeatedly "kick[ed] and punch[ed] [S.M.] while [S.M.] ducked down and tried to protect himself." *Id.* (Compl. ¶¶ 23–24).

After the attack, the man grabbed S.M.'s iPhone, and he and his companion attempted to forcefully exit the bus, at first "throwing themselves at the back door" before "mov[ing] to the front of the bus and confront[ing] the bus driver," who ultimately opened the doors and let the men go. *Id.* (Compl. ¶¶ 25–26). To date, neither of the men has been identified. *Id.* (Compl. ¶ 26).

The attack caused S.M. "serious physical injuries, pain and suffering, and additional emotional harm." *Id.* at 13 (Compl. ¶ 33). He sustained "a broken nose, broken jaw, and three broken teeth;" "suffers from nightmares;" and is now "terrified to ride public transportation." *Id.* at 13–14 (Compl. ¶ 33).

In their complaint, Plaintiffs allege that the entire altercation between S.M. and his assailant "occurred . . . in the direct view of the operator of the bus, who was acting in her capacity as an agent, servant, and/or employee of Defendant WMATA." *Id.* at 12 (Compl. ¶ 27). According to Plaintiffs, "[t]he driver ignored the disturbance and did not take any action to address the situation or prevent harm to [S.M.], in direct dereliction of [WMATA's] responsibilities as a common carrier and in breach of the duty owed to [S.M.] as a passenger." *Id.* at 12–13 (Compl. ¶ 28). Specifically, Plaintiffs assert that the bus driver breached her duty to

3

S.M. by "fail[ing] to activate [the bus's] silent alarm," which would have alerted WMATA's central office and passers-by to contact the police. *Id.* at 13 (Compl. ¶¶ 30–32).

Plaintiffs initiated this action in D.C. Superior Court on April 28, 2021, *id.* at 1, 8, and served WMATA with process on June 15, 2021, *id.* at 1. On July 14, 2021, WMATA filed a notice of removal, Dkt. 1; Dkt. 3 (Errata), in this Court pursuant to Section 81 of the WMATA Compact, Pub. L. No. 89-774, § 81, 80 Stat. 1324, 1350 (1966) (codified at D.C. Code § 9-1107.01(81)). *See* 28 U.S.C. §§ 1441(a); 1446(a). WMATA filed a motion to dismiss on August 16, 2021, arguing that WMATA's sovereign immunity bars Plaintiffs' suit; that the public duty doctrine prevents Plaintiffs from asserting a negligence claim against WMATA; and that Plaintiffs have failed plausibly to allege that WMATA owed S.M. a duty to intervene or proximately caused his injuries. Dkt. 12. Plaintiffs filed their opposition to the motion on October 14, 2021, Dkt. 14, and WMATA filed its reply on October 28, 2021. On November 19, 2021, WMATA filed a "Second Motion to Dismiss," in which it sought to supplement its initial motion with a request to dismiss Plaintiff Afanasieva's claim for emotional distress damages. Dkt. 16. Plaintiffs consented to WMATA's requested relief on December 17, 2021, Dkt. 18, and, accordingly, the Court granted WMATA's motion, Dkt. 16, and dismissed that claim, Minute Order (Dec. 20, 2021). Plaintiffs continue to oppose the basis for WMATA's first motion to dismiss, Dkt. 12, however, and that motion is now ripe for determination.

## II.  LEGAL STANDARD

When confronted with a motion to dismiss under both Rule 12(b)(1) and Rule 12(b)(6), the Court must first consider whether it has subject-matter jurisdiction. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998). Federal courts are courts of limited subject-matter jurisdiction and "possess only that power authorized by Constitution and statute." *Kokkonen v.*

4

*Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  A motion to dismiss for lack of jurisdiction under Rule 12(b)(1) may present a "facial" challenge or a "factual" challenge to the Court's jurisdiction.  *Hale v. United States*, No. 13-1390, 2015 WL 7760161, at *3 (D.D.C. Dec. 2, 2015).  A "facial" challenge to the Court's jurisdiction "contests the legal sufficiency of the jurisdictional allegations contained in the complaint."  *Id.*  When framed in this manner, the Court "accept[s] all well-pleaded factual allegations as true and draw[s] all reasonable inferences from those allegations in the plaintiff's favor" but does not "assume the truth of legal conclusions."  *Williams v. Lew*, 819 F.3d 466, 472 (D.C. Cir. 2016) (quotation marks omitted).  In this sense, the Court must resolve the motion in a manner similar to a motion to dismiss under Rule 12(b)(6).  *See Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002).  Alternatively, when a defendant presents a "factual" challenge to the Court's jurisdiction, the "factual allegations of the complaint are not entitled to a presumption of validity, and the Court is required to resolve factual disputes between the parties."  *Hale*, 2015 WL 7760161, at *3.  In assessing jurisdiction, "[t]he Court may consider the complaint, any undisputed facts, and 'the [C]ourt's resolution of disputed facts.'"  *Id.* (quoting *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 26, 40 (D.C. Cir. 2000)).  When a defendant files a motion to dismiss for lack of subject-matter jurisdiction, the plaintiff ordinarily bears the burden of establishing jurisdiction.  *Id.*  However, "a defendant claiming sovereign immunity in a motion to dismiss 'bears the burden of proving' they qualify for it."  *Broidy Cap. Mgmt. LLC v. Muzin*, 12 F.4th 789, 796 (D.C. Cir. 2021) (quoting *Lewis v. Mutond*, 918 F.3d 142, 145 (D.C. Cir. 2019)).

A motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6) "tests the legal sufficiency of a complaint."  *Browning v. Clinton*, 292 F.3d 235,

242 (D.C. Cir. 2002).  In evaluating a Rule 12(b)(6) motion, the Court "must first 'tak[e] note of the elements a plaintiff must plead to state [the] claim to relief,' and then determine whether the plaintiff has pleaded those elements with adequate factual support to 'state a claim to relief that is plausible on its face.'"  *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015) (alterations in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675, 678 (2009)).  The complaint, however, need not include "detailed factual allegations" to withstand a Rule 12(b)(6) motion.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A plaintiff may survive a Rule 12(b)(6) motion even if "recovery is . . . unlikely," so long as the facts alleged in the complaint are "enough to raise a right to relief above the speculative level."  *Id.* at 555–56 (quotation marks omitted).  In assessing a Rule 12(b)(6) motion, the Court may consider only "the facts contained within the four corners of the complaint, along with any documents attached to or incorporated into the complaint, matters of which the court may take judicial notice, and matters of public record."  *Hamilton v. United States*, No. 19-1105, 2021 WL 2809124, at *4 (D.D.C. July 6, 2021) (quotation marks and citations omitted).

### III.  ANALYSIS

WMATA advances three arguments in support of dismissal: first, that the Court lacks subject-matter jurisdiction because WMATA has not waived its sovereign immunity with respect to Plaintiffs' claims; second, that the public duty doctrine bars Plaintiffs from asserting a negligence claim against WMATA; and, third, that Plaintiffs fail plausibly to allege that WMATA owed a duty to S.M. or proximately caused his injuries.  For the reasons that follow, the Court concludes that Plaintiffs have sufficiently alleged a failure-to-intervene claim based on the actions of the bus driver in this case and that neither sovereign immunity nor the public duty doctrine bars suit with respect to that claim.  To the extent that the complaint raises additional

negligence claims based on WMATA's broader duties to prevent and investigate disorderly behavior on its bus routes, however, the Court concludes that those claims are barred by sovereign immunity.  Accordingly, the Court will grant in part and deny in part WMATA's motion to dismiss.

**A.      Sovereign Immunity**

WMATA first argues that the case should be dismissed for lack of jurisdiction because Plaintiffs' claims are barred by sovereign immunity.[1]  Absent a lawful waiver or abrogation of sovereign immunity, WMATA is immune from suit.  As the D.C. Circuit has explained, "WMATA . . . was created by an interstate compact among Maryland, Virginia, and the District of Columbia, and [it] enjoys the Eleventh Amendment immunity of the two signatory states," as well as immunity conferred upon it by Congress.  *Barbour v. WMATA*, 374 F.3d 1161, 1163 (D.C. Cir. 2004); *see also Morris v. WMATA*, 781 F.2d 218, 219 (D.C. Cir. 1986) ("WMATA's sovereign immunity exists because the signatories have successfully conferred their respective sovereign immunities upon it.").  And "'[a]lthough by its terms[,] the [Eleventh] Amendment applies only to suits against a State by citizens of another State,' the Supreme Court has 'extended the Amendment's applicability to suits by citizens against their own states.'" *Barbour*, 374 F.3d at 1163 (quoting *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 362 (2001)).  The sovereign immunity of the States—and, by extension, WMATA—is subject to "two important exceptions," however.  *Id.*  First, in an exercise of its power under Section 5 of the Fourteenth Amendment, Congress may abrogate the Eleventh Amendment immunity of the States.  *Id.*  Second, "a state may *waive* its immunity and consent to suit."  *Id.*

---

[1] WMATA brings only a facial challenge to the Court's jurisdiction.  *See* Dkt. 15 at 2.

Only the second exception is at issue here.  "The test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one."  *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 241 (1985).  "Generally, [courts] will find a waiver either if the State voluntarily invokes [the court's] jurisdiction, . . . or . . . if the State makes a 'clear declaration' that it intends to submit itself to [the court's] jurisdiction."  *Coll. Savings Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675–76 (1999) (citation omitted).  As relevant here, a court may also find a waiver when a "suability provision [is] attached to the congressional approval of" a multistate commission created by interstate compact.  *Id.* at 686; *see also Petty v. Tenn.-Mo. Bridge Comm'n*, 359 U.S. 275, 279–80 (1959) (holding that States had waived the sovereign immunity of a bi-state corporation created by an interstate compact in which Congress had approved a "sue and be sued" clause); *Edelman v. Jordan*, 415 U.S. 651, 696 (1974) (Marshall, J., dissenting) (discussing *Petty*).

The WMATA Compact contains a suability provision, which states:

> The Authority shall be liable for its contracts and for its torts and those of its Directors, officers, employees, and agent[s] committed in the conduct of any proprietary function, in accordance with the law of the applicable signatory (including rules on conflicts of laws) but shall not be liable for any torts occurring in the performance of a governmental function.

WMATA Compact § 80, 80 Stat. at 1350.  In short, the Compact makes WMATA's waiver of sovereign immunity for torts contingent on the distinction between a "proprietary function[]" and a "governmental function[]."

In this context, the D.C. Circuit has employed a two-part test for distinguishing between governmental and proprietary functions.  *Abdulwali v. WMATA*, 315 F.3d 302, 304 (D.C. Cir. 2003).  First, the Court asks whether the activity at issue is a "quintessential governmental function, such as police activity."  *Burkhart v. WMATA*, 112 F.3d 1207, 1216 (D.C. Cir. 1997) (quotations marks and alterations omitted).  If the activity falls within this category, then

sovereign immunity bars the suit.  *Id.*  If not, the Court proceeds to step two, asking "whether the activity is 'discretionary' or 'ministerial,'" with sovereign immunity protecting only discretionary actions.  *Id.* (quoting *Dant v. District of Columbia*, 829 F.2d 69 (D.C. Cir 1987)).  Discretionary actions "involve[] judgment, planning, or policy decisions," whereas ministerial duties "involve[] enforcement or administration of a mandatory duty at the *operational level*, even if professional expert evaluation is required." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1138 (D.C. Cir. 2015) (quoting *KiSKA Constr. Corp., U.S.A. v. WMATA*, 321 F.3d 1151, 1159 n.9 (D.C. Cir. 2003)).  A ministerial duty is one for which "any statute, regulation, or policy specifically prescribes a course of action for an employee to follow."  *Id.* (quoting *KiSKA*, 321 F.3d at 1159).  Furthermore, if the law or policy leaves some choice about how to act to the governmental employee, the action is a governmental function only if this "exercise of discretion is grounded in social, economic, or political goals." *Id.* (quoting *KiSKA*, 321 F.3d at 1159).

In its opening brief, WMATA argues that Plaintiffs' complaint implicates WMATA's police function—a quintessential government function—because Plaintiffs' "entire cause of action is premised on WMATA's alleged failure to protect alleged patrons from criminal activities of third parties."  Dkt. 12-1 at 4.  As WMATA explains, Section 76 of the WMATA Compact authorizes WMATA to "maintain a regular police force, to be known as the Metro Transit Police, to provide protection for its patrons, personnel, and transit facilities."  *Id.* (quoting D.C. Code § 9-1107.01(76(a))).  Thus, WMATA explains, "the security or protection of WMATA's property or patrons is assigned to WMATA's Metro Transit Police Department," and "[a]ny alleged failure to provide adequate security personnel or failure to prevent criminal activity . . . is a challenge to WMATA"s police function." *Id.*

As support, WMATA invokes this Court's decision in *Gillot v. WMATA*, 507 F. Supp. 454 (D.D.C. 1981). *Gillot* concerned an abduction that occurred at a parking lot owned and maintained by WMATA. *Id.* at 455. The plaintiff alleged that WMATA was negligent in failing adequately to protect her from the abduction. *Id.* Among other things, she challenged "the adequacy of WMATA's police protection," specifically, "the absence of security personnel and inadequate monitoring of the lot." *Id.* at 457. The Court concluded that this claim was barred by sovereign immunity because providing "police protection is a governmental function." *Id.* Here, WMATA asserts that, as in *Gillot*, Plaintiffs' allegations of negligence all concern WMATA's supposed failure to prevent the attack on S.M. through the exercise of its police function, and thus those claims are barred by sovereign immunity. Dkt. 12-1 at 5.

For their part, Plaintiffs insist that the allegations of the complaint are not directed at WMATA's exercise of its police function, but rather at the duty of care that WMATA owed to S.M. in his capacity as a consumer of WMATA's mass public transit services—a proprietary function. *See* Dkt. 14 at 4. Plaintiffs invoke *WMATA v. O'Neill*, 633 A.2d 834, 837–38 (D.C. 1993), which they claim resolves this matter. *O'Neill* dealt with facts similar to this case. The plaintiff in *O'Neill* suffered physical injuries after fellow passengers attacked him on a WMATA bus. *Id.* at 836. The plaintiff sued WMATA, alleging that the bus driver was negligent in not following WMATA's safety directives and in failing to take any action to stop the beating. *Id.* at 838. WMATA argued, as it does here, that the plaintiff's complaint implicated its police function as well as the bus driver's discretionary judgment, and so sovereign immunity barred his claim. The D.C. Court of Appeals disagreed. It rejected WMATA's police-function argument, explaining that "[j]ust because measures such as ordering a passenger to leave the bus or triggering an alarm would have the effect of *protecting* passengers from *criminal* assaults does

not transform them into 'police protection services.'" *Id.* at 839.  And it further concluded that the bus driver's handling of disruptive conduct is not the kind of "discretionary" activity covered by the Compact's "governmental function" exception, because "[t]he acts (or inaction) of the bus driver alleged" did not involve "quasi-legislative policy decisions which are discretionary in nature," but rather "conduct implement[ing] such . . . decision[s]." *Id.*

 *O'Neill*'s interpretation of WMATA's suability provision is not binding on this Court. Because WMATA was formed through a multistate compact approved by Congress, the scope of WMATA's sovereign immunity is a matter of federal law—not state law, *see WMATA v. Ark Union Station, Inc.*, 268 F. Supp. 3d 196, 210 (D.D.C. 2017) (citing *Morris*, 781 F.2d at 220 & n.2), and federal courts do not defer to state court interpretations of federal law, *Williams v. Taylor*, 529 U.S. 362, 377 (2000).  The Court nevertheless finds *O'Neill*'s analysis persuasive as applied to the facts of this case.  Plaintiffs' claims do not implicate a quintessential government function like law enforcement or police work.  Here, Plaintiffs do not allege that WMATA should have deployed police officers or security guards to prevent the attack, nor that the bus driver, or any other WMATA employee, should have arrested S.M.'s assailants or investigated the attack.  Rather, they invoke the "duty of reasonable care" that "WMATA, like any common carrier, owes . . . to its passengers." *O'Neill*, 633 A.2d at 837.  Plaintiffs' suit, in other words, "d[oes] not require the driver to have acted as a police officer;" rather, the complaint "allege[s] that [s]he failed to *summon* the police by the means available to h[er] and in which [s]he had been instructed, or to take lesser steps such as ordering the [assailant] to stop [his] behavior or leave the bus." *Id.* at 839.  A common carrier assumes a heightened duty to safeguard its passengers from harm, but in so doing it does not take on a police function.  Alerting the police

to criminal activity is not the same as exercising police powers to prevent or stop criminal activity.

Nor do Plaintiffs' allegations concerning the bus driver's failure to take any action to prevent harm to S.M. involve the kind of "discretionary" decision-making that amounts to a "governmental function" under the Compact. The D.C. Circuit has explained that, in this context, "[d]iscretionary functions are those governmental actions and decisions" that are "'based on considerations of public policy' and require[e] 'an element of judgment or choice.'" *Abdulwali*, 315 F.3d at 304 (quoting *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988)). "If any statute, regulation, or policy specifically prescribes a course of action' for [WMATA] to follow, then no discretion is involved, since [WMATA] has 'no rightful option but to adhere to the directive.'" *Id.* (quoting *United States v. Gaubert*, 499 U.S. 315, 322–23 (1991)). "In the absence of a prescribed course of action, [WMATA's] decisions are discretionary if they involve 'political, social [or] economic' choices." *Id.* (quoting *Burkhart*, 112 F.3d at 1217). As was the case in *O'Neill*, Plaintiffs here base their negligence claim on the bus driver's alleged "fail[ure] to comply with . . . WMATA . . . policies," Dkt. 3-1 at 15 (Compl. ¶ 43). These policies, Plaintiffs explain, "mandate[] that the bus driver 'instruct [a disruptive passenger] to stop any offending conduct' and 'ask him to leave the bus, but . . . not physically eject him unless there is immediate danger.'" Dkt. 14 at 4 (quoting *Whiteru v. WMATA*, 258 F. Supp. 3d 175, 187 (D.D.C. 2017)). The policy also mandates that "the bus driver activate the silent alarm if he or she observes threats of bodily harm." *Id.* at 5 (quoting *Whiteru*, 258 F. Supp. 3d at 187 (D.D.C. 2017)). Despite these policies, Plaintiffs allege, "[t]he operator of the bus at issue failed to do either of the required actions," and "the attack on SM was allowed to occur and continue." *Id.* Because Plaintiffs allege that the bus driver's duty to act was grounded in a

WMATA policy that "prescribe[d] a course of action for an employee to follow" and did not involve an "exercise of discretion grounded in social, economic, or political goals," *Banneker*, 798 F.3d at 1143 (quotation marks omitted), the Court agrees that Section 80 of the WMATA Compact waives WMATA's sovereign immunity with respect to Plaintiffs' negligence claim.

In its reply brief, WMATA concedes that it "is not immune" from Plaintiffs claim "that the bus operator was negligent for failing to activate a silent alarm or take other action in response to the alleged assault on her son." Dkt. 15 at 1. WMATA goes on to argue, however, that Plaintiffs' complaint contains other negligence claims against WMATA, and that those remain barred by its sovereign immunity. Specifically, WMATA points to two allegations that, it believes, implicate its "governmental function": (1) that WMATA failed "to ensure that the . . . Route 70 bus was safe" in a general sense, Dkt. 15 at 1 (quoting Dkt. 3-1 at 15 (Compl. ¶ 40)); and (2) that WMATA failed "'promptly and properly [to] recognize, investigate, and otherwise respond to' the attack on [S.M.]," *id.* (quoting Dkt. 3-1 at 15–16 (Compl. ¶ 43)).

The Court agrees with WMATA that, to the extent that these claims refer to WMATA's general responsibility to prevent and investigate incidents on its bus routes through the use of its police force and through discretionary decisions about resource allocation and policy, they implicate WMATA's "governmental functions" and thus are barred by sovereign immunity. Scrutinizing WMATA's decisions in these spheres would inevitably involve "judicial 'second-guessing' of 'political, social, and economic decisions'"—the very risk that Section 80's "governmental function" provision is designed to prevent. *Abdulwali*, 315 F.3d at 305 (quoting *Sanders v. WMATA*, 819 F.2d 1151, 1155, 1156 (quoting *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984))). Accordingly, the Court concludes that it lacks subject-matter jurisdiction over Plaintiffs' claims concerning WMATA's alleged failure to ensure that the Route 70 bus was

safe and to "promptly and properly recognize, investigate, and otherwise respond" to the attack

on S.M., but only to the extent that those allegations refer to failures of WMATA's police

powers and policy-making functions.  To the extent that they refer to the bus operator's duty to

intervene, in the moment, to prevent foreseeable harm to S.M., however, the Court concludes

that WMATA has waived its sovereign immunity with respect to those allegations and they are

properly before the Court.

**B.      Public Duty Doctrine**

WMATA next argues that the Court should dismiss the case under Rule 12(b)(6) because

the public duty doctrine shields WMATA from liability for Plaintiffs' claims.  The Court

disagrees.  Under D.C. law, the public duty doctrine shields the District of Columbia and its

agencies from tort liability for "actions [taken] in the course of providing public services."  *Hines*

*v. District of Columbia*, 580 A.2d 133, 136 (D.C. 1990); *see also* D.C. Code § 5-401.02

(ratifying "the interpretation and application of the public duty doctrine by the District of

Columbia Court of Appeals up through . . . September 25, 2014").  The doctrine does not bar

suit, however, if the plaintiff is able show that a "special relationship" existed between the

District and the plaintiff.  *Woods v. District of Columbia*, 63 A.3d 551, 553 (D.C. 2013) (quoting

*Warren v. District of Columbia*, 444 A.2d 1, 4 (D.C. 1981)).  Put differently, "a person seeking

to hold the District of Columbia liable for negligence must allege and prove that the District

owed a special duty to the injured party, greater than or different from any duty which it owed to

the general public."  *Powell v. District of Columbia*, 602 A.2d 1123, 1127 (D.C. 1992).

Although the D.C. Court of Appeals has used "somewhat varying formulations," *Woods*, 63 A.3d

at 556, to describe the criteria for a special relationship, there are at least two ways that such a

relationship may be formed.  In *Morgan v. District of Columbia*, the D.C. Court of Appeals

14

explained that a special relationship can arise from "a specific undertaking to protect a particular individual" combined with "justifiable reliance by the plaintiff."  468 A.2d 1306, 1314 (D.C. 1983).  And, more recently, in *Snowder v. District of Columbia*, the D.C. Court of Appeals held that a special relationship could be created through a statutory mandate to undertake specific acts to protect a particular class of persons, 949 A.2d 590, 604 (D.C. 2008).

As an initial matter, it is not entirely clear whether the public duty doctrine applies to WMATA.  The defendant in this case is WMATA, not the District of Columbia, and WMATA has not pointed to, nor is the Court aware of, any decision that has applied the public duty doctrine to WMATA.  And although this Court has twice analyzed the public duty doctrine in suits where WMATA was a defendant, *see Briggs v. WMATA*, 293 F. Supp. 2d 8, 11–12 (D.D.C. 2003); *Griggs v. WMATA*, 66 F. Supp. 2d 23, 29 (D.D.C. 1999), in each of those cases, the Court analyzed the public duty doctrine only as applied to the *District of Columbia*, which was a codefendant in the case, and not as applied to WMATA.

Because the application of the public duty doctrine is an issue of D.C. substantive law, the Court must predict how the D.C. Court of Appeals would resolve this issue.  *See Metz v. BAE Sys. Tech. Sol. & Serv. Inc.*, 774 F.3d 18, 21–22 (D.C. Cir. 2014); *Saiyed v. Council on Am.-Islamic Rels. Action Network*, 346 F. Supp. 3d 88, 94 (D.D.C. 2018).  It may well be that, were the D.C. Court of Appeals to confront this issue directly, it would hold that the public duty doctrine generally applies to WMATA, since it is a governmental entity.  *See Platt v. District of Columbia*, 467 A.2d 149, 151 (D.C. 1983) (applying the doctrine to "governmental agenc[ies]").  As the WMATA Compact makes clear, WMATA is "a common agency of each signatory party"—that is, Virginia, Maryland, and the District of Columbia.  WMATA Compact § 2, 80

Stat. at 1325; *see also Myers v. United States*, 15 A.3d 688, 688 (D.C. 2011) (WMATA is "a government agency").

But, even if the doctrine applies to WMATA generally, the public duty doctrine does not shield WMATA from liability in this case because WMATA owed a special duty to S.M. by virtue of its role as a common carrier.  On this score, the D.C. Court of Appeals' decision in *O'Neill* is once again informative, this time on a question of D.C. law.  In that case, the D.C. Court of Appeals upheld a verdict finding WMATA liable based on a bus driver's failure to intervene under circumstances similar to those alleged here.  In reaching this conclusion, the *O'Neill* court did not confront the public duty doctrine by name.  But it held that WMATA is a "common carrier" and that a "special relationship exists . . . between a common carrier and its passengers" such that "the carrier undeniably has a duty to protect its passengers from foreseeable harm arising from criminal conduct of others."  633 A.2d at 840.  The D.C. Circuit echoed this view in *Whiteru v. WMATA*, where the court held that "District of Columbia law recognizes the special relationship between common carriers and passengers" and that "'[a] common carrier is under a duty to its passengers to take reasonable action to protect them against unreasonable risk of physical harm.'"  No. 20-7087, 2022 WL 414140, at *3 (D.C. Cir. Feb. 11, 2022) (quoting Restatement (Second) of Torts § 314A(1)(a)–(b)).

WMATA does not dispute that it is a common carrier, nor does it deny the existence of a common carrier-passenger "special relationship."  Instead, it argues that the special relationship WMATA shares with its passengers as a common carrier arises from a separate area of law and, consequently, does not meet the test set out in *Morgan* for establishing a "special relationship" for purposes of the public duty doctrine—that is, the relationship does not involve "(1) a specific

undertaking to protect a particular individual, and (2) justifiable reliance by the plaintiff."  Dkt. 15 at 3 (quoting *Woods*, 63 A.3d at 553–54).  This argument, however, fails for three reasons.

First, contrary to WMATA's argument, *Morgan* does not set forth the exclusive test for the existence of a special relationship in the public duty doctrine context.  In *Woods*, the D.C. Court of Appeals acknowledged that it has "used somewhat varying formulations" to describe the criteria for a special relationship and refers to the *Morgan* test merely as an "example."  63 A.3d at 553.  Similarly, the *Snowder* court recognized "at least two ways to demonstrate a special relationship," 949 A.2d at 604, implying that a plaintiff could show the relationship through other means.

Second, although *O'Neill* does not explicitly address whether the common carrier-passenger "special relationship" is the kind of relationship needed to overcome the public duty doctrine, there is good reason to think that it is.  The public duty doctrine follows from two overarching principles: (1) that the D.C. government "owe[s] no general duty to provide public services . . . to particular citizens as individuals," *Taylor v. District of Columbia*, 776 A.2d 1208, 1214 (D.C. 2001) (quotation marks omitted), and (2) that "absent a special relationship between [D.C.] and an individual, no specific legal duty exists," *Warren*, 444 A.2d at 3.  Thus, the ultimate touchstone of the doctrine is whether a judicially recognized or statutory duty establishes a basis for liability to the plaintiff *specifically*.  On this point, D.C. law is clear: "WMATA, like any common carrier, owes a duty of reasonable care to its passengers."  *O'Neill*, 633 A.2d at 837 (quoting *McKethean v. WMATA*, 588 A.2d 708, 712 (D.C. 1991)); *see also Whiteru*, 2022 WL 414140, at *3; *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 794 (D.C. 2011); *WMATA v. Johnson*, 726 A.2d 172, 176 (D.C. 1999); *Sebastian v. District of Columbia*, 636 A.2d 958, 962 n.6 (D.C. 1994).  This duty, moreover, is distinct from a *general* duty owed to

the public at large, because WMATA owes a duty of care only to passengers.  *McKethean*, 588

A.2d at 712; *see also Briggs v. WMATA*, 481 F.3d 839, 844–45 (D.C. Cir 2007).

Finally, WMATA's preferred approach is in tension with the results in *O'Neill* and

*Whiteru*.  Although the D.C. Court of Appeals did not explicitly address the public duty doctrine

in *O'Neill*, in affirming WMATA's liability the court emphasized WMATA's "special

relationship" with its passengers—which, as discussed, is the key exception to the public duty

doctrine.  *Woods*, 63 A.3d at 553.  The D.C. Circuit, moreover, recently relied on *O'Neill*'s

characterization of this "special relationship" to conclude that WMATA's duty to its passengers

is sufficient to overcome D.C.'s contributory negligence rule.  *Whiteru*, 2022 WL 414140, at *3.

The Court's role when confronted with an issue of state law is to predict the D.C. Court of

Appeals' most likely disposition of the issue.  For these reasons, the better view is that the public

duty doctrine does not bar Plaintiffs' failure-to-intervene claim.

## C.    Negligence

WMATA further maintains that Plaintiffs fail to state a negligence claim because

Plaintiffs have not plausibly alleged that the assailant's criminal acts were foreseeable to

WMATA, and, thus, Plaintiffs have not alleged that WMATA had a duty to intervene or that

WMATA's inaction proximately caused S.M.'s injuries.  Dkt. 12-1 at 7–9.  This argument also

fails.

To plead a negligence claim, Plaintiffs must allege "(1) that the defendant owed a duty to

the plaintiff, (2) breach of that duty, and (3) injury to the plaintiff that was proximately caused by

the breach."  *Poola v. Howard Univ.*, 147 A.3d 267, 289 (D.C. 2016).  As discussed, WMATA

owes its passengers the duty of reasonable care, including the duty of a common carrier "to

protect its passengers from foreseeable harm arising from criminal conduct of others." *O'Neill*,
633 A.2d at 840.

WMATA does not dispute that it is a common carrier and that it owes its passengers a
duty to protect them from foreseeable harm.  Dkt. 12-1 at 8; Dkt. 15 at 4.  Rather, it claims that
Plaintiffs have not adequately alleged that the harm to S.M. was *foreseeable* to the bus driver.
According to WMATA, the complaint contains "no allegation [that the assault] was foreseeable"
and "WMATA is not alleged to have known anything about it before or while it was occurring."
Dkt. 12-1 at 9.  These failures are significant for two reasons, WMATA claims: first, under D.C.
law, if the assailant's criminal acts were not foreseeable to the bus driver, then the circumstances
did not trigger the bus driver's (and, consequently, WMATA's) duty to intervene, *id.* at 8, and,
second, if the assailant's attack on S.M. was an unforeseeable intervening criminal act, then it
"br[oke] the chain of causation" with respect to WMATA's actions, and thus WMATA did not
proximately cause S.M.'s injuries, *id.* at 9.

WMATA correctly states the law, but it misreads the complaint.  At the motion to
dismiss stage, the Court "must accept the complaint's allegations as true and draw all reasonable
inferences in favor of the non-moving party."  *Gordon v. U.S. Capitol Police*, 778 F.3d 158,
163–64 (D.C. Cir. 2015).  As relevant here, Plaintiffs allege (1) that S.M. "was sitting toward the
rear of the bus in a seat on the elevated platform," Dkt. 3-1 at 11 (Compl. ¶ 19); (2) that when
S.M. refused to sell his iPhone to the assailant, "[t]he man and the group of girls became louder
and everyone on the bus could hear the commotion," *id.* at 12 (Compl. ¶ 22); (3) that, shortly
thereafter, "the man tried to take off [S.M.'s] glasses," prompting S.M. to "push[] the man's
hand away," *id.*; (4) that, in response, the assailant "dump[ed] a bag of potato chips on [S.M.'s]
head while the girls laughed and cheered the man on," *id.*; (5) that the assailant "again attempted

19

to take [S.M.'s] glasses," and, when S.M. again "slapped the man's hand away, the man punched

him in the side of the head," *id.* (Compl. ¶ 23); (6) and, finally, that the man proceeded to

"vicious[ly] attack" S.M., "kicking and punching" him repeatedly before stealing his iPhone, *id.*

(Compl. ¶¶ 24–25).  Importantly, Plaintiffs assert that "all of [the] above events . . . occurred . . .

in the direct view of the operator of the bus, who was acting in her capacity as an agent, servant,

and/or employee of Defendant WMATA."  *Id.* (Compl. ¶ 27).  These allegations are sufficient to

permit a reasonable inference that the bus driver was contemporaneously aware of the entire

altercation.

But that still leaves open the question whether the criminal acts of the assailant were

foreseeable to the driver, such that the driver would have had a duty to intervene and her failure

to do so would have proximately caused S.M.'s injuries, notwithstanding the assailant's

intervening acts.  To show that criminal conduct is foreseeable, a plaintiff must demonstrate that

the defendant had "an increased awareness of the danger of a particular criminal act."  *District of

Columbia v. Doe*, 524 A.2d 30, 33 (D.C. 1987).  In general, a violent attack is not foreseeable

merely because it is preceded by a verbal altercation.  *See Harris v. WMATA*, 490 F. Supp. 3d

295, 310 (D.D.C. 2020) (citing *Ellis v. Safeway Stores, Inc.*, 410 A.2d 1381, 1382 (D.C. 1979)).

WMATA compares the facts alleged in this case to those of *Milone v. WMATA*, 91 F.3d

229 (D.C. Cir. 1996).  In *Milone*, the D.C. Circuit reversed a jury verdict that had held WMATA

liable for a bus driver's failure to intervene on the behalf of a victim assaulted on a bus.  *Id.* at

232.  In holding that the assault was not foreseeable to the driver, and thus did not give rise to a

duty to intervene, the court observed that, before the assault, the evidence showed only that the

assailants were generally rowdy, making loud popping noises and shouting things like "ding,

ding, ding, next stop" and "[h]ey whitey, whitey wants to get on the bus."  *Id.* at 230.  The

victim, moreover, did not inform the bus driver of the incident and only offered her own opinion testimony to prove that the noise level before the assault was loud enough for the bus driver to hear.  *Id.* at 232–33.

In contrast, Plaintiffs argue that this case is similar to *O'Neill*.  In *O'Neill*, two apparently drunk men boarded a bus and for ten minutes loudly and repeatedly threatened to kill passengers on the bus.  633 A.2d at 835–36, 840.  Three different passengers asked the driver to eject the men, but the driver refused.  *Id.* at 836.  One of the men then began punching the plaintiff, at which time the driver finally activated the silent alarm.  *Id.*  On these facts, the D.C. Court of Appeals held that the jury reasonably found that the driver should have foreseen the assault on the plaintiff and intervened "well before" the assailant beat the plaintiff.  *Id.* at 840.

The Court is persuaded that Plaintiffs have alleged sufficient facts to permit a reasonable inference of foreseeability.  Although the factual allegations in this case are not as dramatic as the facts in *O'Neill*, *O'Neill* is nevertheless more instructive than *Milone*.  The acts of the assailant that Plaintiffs allege preceded the attack, even if not as alarming as those in *O'Neill*, nevertheless give rise to a greater likelihood of subsequent criminal acts than the assailants' actions in *Milone*.  In *Milone*, the evidence showed that the assailants were rowdy in the moments before the attack, but they did little that might have suggested to the driver that an assault or battery was imminent.  *Id.* at 231.  Here, in contrast, before the assailant punched S.M. in the head and repeatedly kicked and punched him, he arguably committed a battery under D.C. law by attempting to take off S.M.'s glasses and dumping the potato chips on his head.  *See Evans-Reid v. District of Columbia*, 930 A.2d 930, 937 (2007) ("A battery is an intentional act that causes a harmful or offensive bodily contact.") (internal quotations and citations omitted).  And, in any event, Plaintiffs have alleged sufficient facts to permit the reasonable inference that

21

the attack occurred over a not-insubstantial period of time, such that after the initial punch occurred, the driver was put on notice about the attack and could have taken steps to end the altercation, thereby preventing further harm to S.M.

Finally, the Court notes that, under D.C. law, proximate cause is "ordinarily a question of fact for the jury," and only in "exceptional" cases does it become a question of law for the Court to decide. *Convit v. Wilson*, 980 A.2d 1104, 1126 (D.C. 2009) (quotation marks omitted). For the reasons stated above, this is not one of those exceptional cases.

In sum, the Court concludes that Plaintiffs have pleaded sufficient facts to allow a reasonable inference that the attack on S.M. was foreseeable to WMATA and, thus, that WMATA had a duty to intervene and proximately caused S.M.'s injuries. Accordingly, the Court will deny WMATA's motion to dismiss with respect to Plaintiffs' failure-to-intervene claim.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss, Dkt. 12, is hereby **GRANTED** in part and **DENIED** in part.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  March 3, 2022